First case this morning is 23-50632, United States of America v. Abbott. Thank you, Chief Judge Richman, and may it please the Court, for most of its length and much of its historic history, the Rio Grande has been little more than a creek of water, a river that has never shifted course to transport passengers or to merchandise, except for its mouth. Today, in its nearly identical capacities, the water is admittedly more consistent, but only in deterioration in its structure that further becomes water trouble. Nevertheless, the United States alleges, the District Court agrees, and the panel confirms, that the Rio Grande is now a river subject to the same federal controls as the Mississippi. If the U.S. is right, then any body of water would be deemed an active river and thereby subject to federal jurisdiction if 1. The United States Army has ever investigated whether it can be navigated, 2. It can be or ever could have been crossed by means of a boat, or 3. It could, hypothetically, through the investment of potential infinite resources, be made to Because every body of water in this circuit meets one of those three conditions, that rule is irreconcilable with the fundamental pedagogical principle of our federal system, reiterated most recently in Sacramento, and I quote, that regulation of land and water use lies at the core of traditional state authority. And it is unjustified by the language of the relevant statute that has, for nearly a century, been interpreted to apply to waterways that, in their ordinary or natural condition, serve the property of interstate commerce, across which trade and travel can be or is conducted in the traditional or normal means of travel on the water. Moreover, in asking this Court to prove the exact conducts were not enough to confront federalism, the federal government also asked it to hold that the state must get a permission slip from Congress in order to take even temporary measures to protect its citizens from hostile interests trying to enter its territory. Because the district court did so without even showing of the harm to legitimate commercial shipping, its order is far from equitable and should be reversed. I welcome the Court's questions. So one of the things that the district court decided was that the question of whether Texas has been invaded is non-justiciable. Isn't that right? Yes, Your Honor. Do you agree with that? It is non-justiciable. I don't agree with the implications of the federal government that's wrong on that. Well, if it's non-justiciable, then Texas action would stand because it can't be judicially reviewed. And if that's true, then our case law says that a non-justiciable matter means that the district court has no jurisdiction. So this matter would be dismissed. I'm a little curious as to why. I think you disagree with all that. I'm a little curious as to why Texas hasn't pressed that issue because it's jurisdictional, so we have to consider it for anybody. We do agree with your assessment as to what that would mean. The federal government has asserted instead that because it is non-justiciable, that the district court cannot consider it and the defense becomes irrelevant. That's not what the Supreme Court said in Moyer v. Peabody, which said that in fact the governor in that case, I believe it was Colorado, determined that there was an insurrection that was sufficient and stood by itself. And that was the one that lines your monitor closely. And that's what the Texas action does greatly. Because, I mean, it would be sort of bizarre, wouldn't it, if Texas action stands because that's the constitutional power of the state, that it could be overridden by the statutory power of the federal government. That stands everything on its head, it seems to me. Yes, Your Honor. We agree with that. That to date, the way the case has been litigated has been litigated on the grounds of applicability because that's the way the United States has pressed this claim. But we do definitely agree with Your Honor that the district court cannot question whether or not there has been an invasion. That the governor's declaration of that case is possible or unclear. So it would be the end of the case. Essentially, yes. What about the Supreme Court's decision in Zivotofsky v. Clinton? In Zivotofsky v. Clinton, it didn't address the insurrection issue entirely. The difficulty with the justiciability version of the invasion clause issue is that's typically raised where it is the claim that is being asserted is non-justiciable. Here, the question is that it's a defense that's non-justiciable. But this defense would be dispositive in this case, Your Honor. Can we turn on the mic? Counselor, we know from Tugwell and Wiley that ferry commerce, even illicit commerce, the reason for the moving barrier, does cross the Rio Grande here. It did in the 19th century. So historically, it has. And today, we have 28 bridge and border crossings. And all but four states are divided by border rivers. So is your position legally that the Army court does not have authority to dredge border rivers between all but four states, and especially between Canada and Mexico, to allow for traffic, foreign commerce, interstate commerce that's necessarily across border rivers? Not necessarily. And I'll try to speak up, Judge Jones. And this goes to the Oklahoma case, where the court determined that just because it is a boundary water does not mean that it is a navigable river within the purposes of the Rivers and Harbors Act. Now, there may be another statute or another power that would allow the Army court to dredge those waters. But under the Rivers and Harbors Act, it needs to be navigable, as the United States conceded on pages 78 to 79 of the record. And here, the existence of ferry traffic does not establish this navigability. And going back to the Oklahoma case, where navigability turns on whether or not there is sufficient depth to have boats of sufficient draft to ascend and descend the river, that is, go along it, not simply go across it. Because navigability turns on whether it's used as an interstate highway. And Your Honor, could cross under I-10 here in New Orleans, which wouldn't describe it as used as an interstate highway, just as used as an interstate highway would be driving from New Orleans to Houston. So that's what's being implemented by this particular statute. And the United States, as the master of its complaint, has chosen to sue under this particular statute. So that's in the text. The theories by themselves are not sufficient. No one says that there is currently commerce in the way that I just described it. Because as Your Honor just noted, the commerce is crossing it. It's illicit. But most importantly, it's off the foot. And under the Florida Act, just being able to board a river does not make it navigable. You said that the U.S. might still be here. No. No. Can we get to that? I'm happy to continue, but I do worry that this is not going to work. It's now, Tom. Now. Just in one week's time. You mentioned that the U.S. is the master of its complaint on taking a procedural direction. The events of this case took place in Del Rio, not Austin. They took place in Eagle Pass, which is downriver of Del Rio. This was preceded in Austin? Yes, Your Honor. And that was the United States' choice? Yes, Your Honor. Do I understand correctly that in Austin, these cases are assigned not randomly, but were selected by the judge for this case? I'm not familiar with how the West Commission assigns its cases. But my understanding is that there is some level of division applied to the judges in this case. I think the case back in order says that this judge makes, it's not random. I believe so, Your Honor. Does that affect our rule at all, or do we review it no matter what? We review it the same, basically. I believe that you review it the same. How it was assigned to this particular judge should not be relevant to this particular case. It doesn't matter. It's one child. We can just review the case. Yes, Your Honor. And in this particular instance, the issue that needs to be reviewed is whether the United States is in favor of showing that this is an aggregate. And that is a question of mixed-factor law and Appellation Power, page 404, where the standard and the ultimate conclusion are in the work of the Supreme Court, and it's certainly intertwined. And here, that this Court made a number of legal errors. For example, it relied very heavily on administrative crime and inevitability when that administrative agency itself recognizes at 33 CFR 329.3 and 329.14 that it is inconclusive of the courts. And even if the court were to look to the factual basis of that determination, we're looking at a 1975 report created by the United States Department of Labor Engineers that found that it was unnecessary for the Department of Labor to determine that that past inevitability occurred based on what Judge Willett described in his dissent as unrelatable treaties and statutes. So we're looking at the same treaties and statutes, whether we're talking the 1975 report or the statutes themselves. And under the Oklahoma case, as well as the common economic life of power, page 120 of that case, a statute is not made navigable in law when it's not navigable in fact. And that state, page 103 of the record, determined that there had been no useful navigation between Roma and El Paso, a distance of about 1,000 miles, or roughly speaking, the distance between Washington, D.C. and Mobile, Alabama. What is the burden of the United States at this juncture of the case? Because we are still a preliminary injunction state, right? We are preliminary. The burden is not so much as we have submitted into the record some re-judgment type evidence. So what is the level of evidence that is required in the United States at this juncture of the case? A likelihood of successful inheritance. And here, they have not even offered that much evidence because they rely on this one report and one witness who admitted that they had never seen any cars. He also admitted that there, that he admitted the boonies did not follow the definition of the terms used in the statute. That's the evidence they offer, and that's insufficient for approval. The district court also cited a witness. The government has shown its observation that Texas put a barge alongside the barrier. The, to stabilize the, to stabilize the barrier. Which has 3,000 pounds in the anchors. It sounds inevitable, but maybe it's sporadic, getting the barge out there at once. If, at trial, the government were to show that there's a peer for the border patrol to use border patrols up and down this portion, would that be proof that it's inevitable? If there's a peer for border patrol boats to go up and down around Eagle Pass, yes or no, giving Section 10 authority to the owner? Not under the Rivers and Harbors Act, because it is not under the words of Rio Grande, which ironically found that this is the same river, the non-navigable, or Oklahoma or half a dozen other cases, useful for trade or agriculture. The boats that are, that can float in this water can also, for brief periods, go over land because of the way they're constructed. They are so shallow that that's not, that they're not able to carry useful cars. Which is part of what the district court found in the alternative, that the river could be made navigable. But going to Judge Douglas' question on the preliminary injunction factors, the United States didn't offer any evidence on that grounds either, because as Appalachian Power, their strongest case at this point noted, the improvements that would be necessary have to be reasonable, and they offered no evidence that that was no better. And again, ironically, Appalachian Power, at Coonville 26, in contrasting what would be reasonable versus what would be unreasonable, cited what was required for improving the degree of the land to make it navigable as an example of what is unreasonable. Because it would take many millions of dollars to create a canal. And admittedly, that was a different piece of the river, but it's the same problem, which is too many rocks and not enough water. The only reason you cannot provide a stretch is because the irrigation district, that is not too much as deep. And there has been some suggestion that they could just, well, re-prioritize the water. But the priorities are set by treaty, and frankly, they're just not enough water. So as a result, to get useful traffic would be completely unreasonable. To illustrate that, I would point this honor, your honor, to the Crow case, which was from 1972, or roughly contemporaneous with the 1975 report, upon which the United States is reliant. And in that case, the United States offered evidence that it would take a 9-foot-deep, 100-foot-wide channel for useful traffic, and that is to make the Rio Grande, which is 200 feet deep, but only 18 inches, sorry, 200 feet wide, but only 18 inches deep, to have that size of channel would be a massive undertaking that would have, in the words of that same report, serious ecological concerns. Now, the United States has responded to that by saying, well, in other cases, it was two to three feet deep was all that we needed. But at that time, we were talking about a different type of commercial navigation, and they were talking about improvement at the time when we were using flights for commuters. To say that that was still the definition of reasonable, and that was to rematch, mismatch between a situation where it would have been improvable for commuters based on technology to blast out a canal that only exists at a time when we no longer use the commuters. And that was a situation that created a rule that any body of water in the circuit would be navigable, which had been consistent with that rule. If your argument is correct, would any future president be unable to solicit proposals to build a wall, a similar buoy wall, without permission in Texas? Would the president of the United States and his army corps be unable, without permission, in Texas to build a buoy wall? No, Your Honor. And this goes to some of the very cases that they cite, which is there are the differences between what would be within the president of the federal government's power and the statute that they have enacted or cited. The president has numerous foreign affairs powers under the Youngstown test. He might allow them to build that wall. However, the question here is whether Texas also has that authority, and it does. Your Honor, here on human trafficking, is it correct that at this preliminary stage no one is relying on human trafficking either as a basis for Texas's actions or the United States's position? Is that correct? That would mean, well, Texas has relied on trying to prevent the infiltration of violent cartels which are involved in human trafficking for our entities, our demand. But they are not, to the best of my knowledge, relying on human trafficking to establish commerce. Okay. What about drownings? The district court seems to have made a point about drownings, which I understand were not at this point and were not related to the border patrol, you know, but the district court has this in one of its opinions. Is anyone relying on prevention of drownings for the Texas's position or the United States position? I think the district court alluded to this, but it seems to be an allusion. It is an allusion, which is highly problematic because there's no evidence of drownings in this record at all, for good reason. There were a couple of bodies found in the vicinity of the buoys, but they were not found to have been related to it at all. Tell me, I'm going to point your honor to the United States' witnesses for Gomez at ROA 476 and 1379, who admitted there were no concerns for the entity. The result of that question was also discussed by our witnesses at Esquimont on page 1275 and 76. These buoys are moderate 24-7, so there is no concern for safety. Do they make it safer because people are not trying to pass it in places that's not suitable? Indeed, that's your honor. That was the purpose of the buoys, is to try to encourage people to pass over, to pass into this country via a local point of entry, which is at a bridge, and you can't drown on a bridge. And that's because the court hasn't made any paper. That's difficult to determine, your honor, but we are not aware of anybody who was harmed by the buoys, and in a different case, again, that's not in court, the different court in question did suggest that by trying to buy the various means that Texas has channeled, used to channel people to the local points of entry, that it has, in fact, made it safer. How do we determine the effect of changing the economics of the navigation on the Weir Grand? There's some statement that the federal government, about 100 years ago, wherever they've been, in general, made it uneconomical to improve certain parts of the Weir Grand, or whatever it was, generally. How does that factor in to our analysis of whether the river could be made in a more useful, more global economic way? Is it only today, and how economic it would be today, or it would have been economic a lot of years ago, except the river? Your honor, I think that it's two separate questions. If there had been an effort to improve the river at the time it would have been useful in the 19th century, then that would be considered in terms of navigability. The fact that it wasn't, and that the only situation where anybody actually traveled up through Eagle Pass was a military expedition in the 1850s, and nobody went back, suggests that at the time, it would have been unreasonable. Today, however, we could still theoretically, under their view, admittedly, not ours, but to take the point of your question, you could make it, whether you can make that here today, it would need to be useful for commercial activity today, not would have been useful today based on boats that haven't been used in a hundred years. So as a result to... What are you asking now? What case law says you're looking at today on whether it could have been made, when it could have been made, as opposed to whether it could have been made at one or another time? I'm looking at Appalachian Power for that, which says that it is reasonable based on when the improvements would have been useful. So an improvement for a canoe today would not be useful because there's no commerce in Texas that's being done by a canoe, whereas an improvement for a canoe in the 19th century would have been useful. That's also been caught by Indies, and they put a register of the same language. There are no further questions on that. The ability to touch briefly on the obstruction and the structures issue. The United States has equated the obstruction and the structures question and actually defined structures as anything that creates an obstruction. That's a problem under the statute of statutory languages, because under section 9 and section 10 of the Rivers of Commerce Act, the Congress has been very specific about what types of things require congressional permission to look, what types of things require the Army Corps permission to look, and what types of things require both. And here, to be center-distinguishing them at all, they're saying obstruction is a broader term than structure, which doesn't make a lot of sense, because that requires Congress to approve more than what would be required to be approved by the Army Corps. So that's a flip-flop. So in the structures category, they've admitted, and their own witness admitted, that the issues do not fall within his understanding of any of the relevant terms, which is why there isn't a lot of reliance on the term other structures. But reading that phrase in its larger statutory context suggests it has to be a more limited notion than it might otherwise, if those two words had been used in isolation. And the genesis of structure, that issue, all poked out into the river and obstructed traffic, or impede traffic to try not to use the same word. That goes to even their own definition of boom, and their preliminary injunction says something that goes across the river. The Louie's do not do that. In fact, their own witness admitted as much, that you can pass by Louie's with ease. They, in this report, said, well, you have to take notice of it, so therefore it's an obstruction. That's inconsistent with page 250 of the Wilson case, and I'm quoting here, if vessels can freely pass between the creek piers of a bridge, it seems to us that the common right of navigation is preserved. So the notion that you're going to have to observe and to go around things in the river is well-established in Adelaide's law, and not just at least by the Rivers and Harbors Act. It's also not an obstruction, as that term has been interpreted in, for example, the Republic Seal case, because it has not tended to destroy the ability to use ships in the river. Now, that's a bit of a metaphysical question, because there are no ships in this river, but the Louie's are only at R1-4 feet, and the District Court's is 16 feet wide, in a 200-foot-wide river, and the testimony is on the shallower end. So you would be traveling on one side of it regardless. That does not tend to destroy whatever ability there is to go to judge Higgins for questions for boats on the Customs and Border Control to pass them. There are no further questions? Well, it would certainly obstruct if navigability can be shown by traffic coming from the west at one point, and obstructing us to stop that human, illicit Americans traveling. It would obstruct it, but that doesn't tend to destroy the navigability, because it's a 1,200-mile river. That's assuming that the mule is highway up and down. Yes. My point is, every border river, we're primarily talking about commerce between states or between countries, but factually, the full architecture of this barrier system starts with a 3,000-pound sand anchor, then directly from the water, then has 40 feet of chain, and then you get to the floating buildings. Is that correct? Not exactly, Your Honor. The 40 feet of chain is largely on the bottom of the river, because there are lights to allow the Louie's to raise their supply. For the most part, the chain is only about 18 inches deep for that eligible waterways. I would push back on the premise that border traffic is primarily across between the countries, and for that, I would point, Your Honor, to the 1848 Treaty, upon which my time has relied significantly. And I point, Your Honor, specifically to Article VI, although we have focused very heavily on Article VII in this litigation. I think Article VI really tells you what you're talking about when it comes to navigation, because at the time, pre-Gadsden Purchase, there was a necessity to be able to travel between different pieces of property, not getting along into the United States. And Article VI talks about navigation between those that belong to the Colorado River and into the Gulf of California. That is, as we described, we're using it right by intent, not crossing from the U.S. into Mexico, which is actually specifically forbidden without the consent of Mexico. Everyone, if you have any questions, please remain at a reverse, and I'll see you in a few minutes. Good morning. May it be reported, my name is Michael Gray. I'm here on behalf of the United States. The District Court did not abuse its discretion when it issued a preliminary injunction requiring Texas to move its southbound long barrier from the middle of the Rio Grande. And just as important, prohibiting Texas from building any more barriers in the river while it's superintendent. The District Court correctly concluded that the United States is likely to prevail on its claim that Texas violated the Rivers and Harbors Act of 1899. When Texas built that unauthorized structure in the Rio Grande, it obstructed the rivers and avenues of the past. Likewise, the District Court correctly concluded that the equity of space was preliminary, but we disported the firm. Now, I think it's important at the outset to say that the context of this appeal matters a lot to its resolution. We are here on a preliminary injunction appeal that was conducted on an expedited basis. The Court is conducting clear error review of factual findings, including navigability, which is a factual question. The District Court parties are preparing for trial and developing further record evidence, especially on navigability questioning. We were not required to prove the title of the son's judgment to obtain a preliminary injunction. Now, as far as navigability is concerned, there's significant evidence of navigability here, and it comports directly with the case law navigability. The District Court correctly found aspects of this area was historically navigable based on the evidence at the state of proceedings, most prominent being ferry cross-river ferry traffic, which is expressly foreign commerce conducted on the river by floating structures, boats. That foreign commerce is sufficient to bring the area that's in Congress's package together. Cross-river ferry traffic on the river, Congress can regulate that commerce. It's clear under the case law, and there's no reason to think it didn't intend to do so at the Riverside Commerce Center. In addition to that, you also have the expedition. You have the statutes preserving navigability. And counsel talked a lot about Appalachian Power, and that fully supports it here, because Appalachian Power says there's a flexible test with no set formula, that shallow areas didn't matter, that we're preserving Congress's authority over the potential channels of commerce, that improvements don't need to be completed or authorized. There, the improvements the Supreme Court found and the court had found were cost-prohibited at the time. The court said the question was whether the cost at the time of the improvement would be useful. And just this year, the railroads had come in Appalachian Power, making the cost, making the improvements not useful. And the new river was very similar with rapids and falls and other obstructions. I mean, even more so, you had not large navigation. You had a survey like here, but they'll make it halfway up the road and scratch it and isolate its loading. And to the question about border patrol traffic here, border patrol was on the river, you know, basically every day. And Appalachian Power said, nor is lack of commercial traffic the bar. Well, personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation. So we fall directly within that. The river is navigable, and the district court did not commit any clear error or defiance of it based on this, based on the record at the time. There was a question about drownings. Really, the drownings was more to harm, directable harm. There was evidence here that any obstructions of the river, including this obstruction, could impair response times of the border patrol, because the border patrol does rescues on the river. So from 2018 to 2023, the testimony in the Covenant's Declaration, this is in the record 1041, was that they conducted 249 rescues, and there were 89 murder-reported deaths in that period, and the border was closed by the Declaration, was that this could impair response times to those rescues. On the, there was a brief discussion at the beginning about the invasion and the political question of the document, and I think it's important here to consider two things about that. First is the arguments actually made at this stage in the context of those arguments. All that Texas has argued at this point is that the constitutional issue should inform this court's consideration of the statutory issue. The constitutional avoidance is the only thing that they've argued. And if you look at the Nielsen case from the Supreme Court, immigration-related case from a few years ago, Justice Alito opinion, the court says it's not going to consider constitutional questions in that context, where the only argument made is that it ought to enforce the statute. Justice here, even their constitutional concerns are offered as just another pillar of their argument for the preferred reading of the language of the statute. And so the question is, is the statute ambiguous? Because constitutional avoidance doesn't come into play at this time. And here, the Rivers and Harbors Act is not ambiguous. Texas is just arguing that its conduct ought to be excused from the act or that the facts of its conduct don't fit the act. So the entire constitutional issue really isn't presented before the court at this point. It's only whether the Rivers and Harbors Act is ambiguous. And as we described, it's not. The second point I wanted to make on that is on the political question document. There's no political question that is tied up in our claim. The Rivers and Harbors Act claim, based on its structure, is the same, no matter what the structure or the context is. The only political question that could arise in this case is inserted by Texas as a potential defense, which they've raised only in the context of the preliminary injunction so far in this constitutional issue. And so what the district court said, I think, correctly is that you cannot defeat a claim that doesn't present a political question by inserting your own political question and then saying it can't be reviewed. That's a defense. And I think that is entirely correct to make the departure. It says it's the political question document, not the political case document. And so I think it's very important. I mean, even that arises in the context of this constitutional avoidance argument. So I don't think it's grounds at this point for dismissal. I think those are the affirmative points I wanted to make. I applaud the court's questions. So I wonder what you do with Common Cause v. Richard, which was a 2019 decision of the Supreme Court. That case raised not only political gerrymandering, but several other issues, the Equal Protection Violation, the First Amendment, Article I, Section 2, and the elections laws. But the Supreme Court said that it's not justiciable as a political question. And so the court said the case was, quote, remanded with instructions to dismiss for including the issues that weren't bound up in the political question. Right. But I think the political question, you know, the claims itself were inextricably intertwined with the political question there. And the claims are what raised the question. Whereas here, as I said, the Rivers and Harbors Act claim will be the same no matter who built the structure or what the structure was. But every claim has to do with Texas' implication of its undeniable war power in the event of here an alien invasion. So you can't ignore that. If it's not justiciable, then the action that Texas has taken stands unmolested because it can't be reviewed. Even the district court agreed with that. Well, I think the district court agreed that it can't be reviewed. But certainly, I didn't agree that Texas' actions, you know, whether what the district court held, and I think it's correctly in line with the California case, the New Jersey case, the Potawatomi case, and including a case from this circuit also involving immigration, that whether immigration can rise to the level of invasion is a political question that is beyond the court's confidence. But that doesn't mean that the claim cannot be decided. The political question, Dr. Arnn, is not a sword that a state can use to unbind itself from all of federal law. But, Mr. Arnn, excuse me. Are you saying that federal law becomes a constitutional right of the state? That's not what I'm saying. I mean, I do think the state has to hear where there's no conflict. We've talked about there's no conflict between Texas' asserted rights and the federal statute. Texas is obligated, you know, we certainly haven't established a conflict, obligated to go ahead and comply with a statute by a court in big Singapore seeking permission, seeking a permit. So assuming that the question of invasion is not justiciable, which I believe you agree with, then under what circumstances can the United States thwart that attempt at self-defense? Well, I think it probably would be, although, you know, there's some, you know, sterling reconstant that, you know, since these questions can be reviewed in some circumstances and that a governor can't, you don't just rely on a fiat from the governor to overcome the consequences. What's the best case for that proposition? I mean, personally, I haven't gotten interested in this until Governor Smith raised it, but now I'm interested. Well, certainly, certainly it's a good case, I think, I think on that. And, all right, so let me follow up with a procedural question and a substantive question on the invasion issue. Procedurally, hypothetically, if a citizen were to sue the President of the United States because they were injured bodily or their property was injured due to the President's indication of the man or chief of power, some sort of military action, would DOJ argue that that was part of that, that that assault or trespass claim was part of the question? Or are you telling me that DOJ would not make that argument? I don't know if it would, I think we would certainly have various defenses to that, including those that I would probably be, I'm guessing, would be one of them, but I haven't known those questions to be clear. There's plenty of evidence that DOJ would have asked in order to make some sort of question. All right, let me make a substantive question real quick. As I understand the debate between both sides on the invasion issue, there's a lot turning on this 1874 exchange of correspondence between the Texas governor and the Attorney General of the United States. You cite pages 13 through 15 of the House, of the Congressional Court, and I think your theory is that these were softened, no Mexican actions, rather than private Mexican actions. So I look at pages 13 through 15, don't you think you said the exact opposite, that these were private actions to which the Mexican government simply didn't help those United States citizens who were hurt? I don't think we were, I don't think we were characterizing that as sovereign, or meaning that as sovereign action. I think it was, it was definitely an armed incursion by, you know, Cortina's men, who I think, as you're saying, with the permission of the Mexican government, or acquiescence of the Mexican government. But the action of the Mexican government. Correct. So these were, you agree, these were private raiders, I guess you'd term them, such as garage raiders. Right. And on the, you know, merits of the substance of the question, I think, you know, you need, sorry, you know, it's, you know, we've explained it in other cases, you know, you need some sort of hostile organized force, you know, in each direct challenge. Let me turn to the case itself. Were any of these cases talked about in the 1874 incident? No, I don't, I don't think so. I mean, that was something that Tenet had just raised, that we were, we were responding to. Understood. It was raised in this report as well. Yeah. So, you know, I, I don't think we take issue with the fact that there could be circumstances where you have an armed hostile force that might trigger temporary powers in the state, but it's not, you know, once the federal government is responding, you know, the war powers are dedicated to the, to the federal government, not the Constitution. And in the states, their argument is that once we say invasion, we can do anything we want for as long as we want. I don't think that's right, even if there are some circumstances. Well, the federal government has the constitutional power to take over the national park, but I take the governor's statement that the AG agreed to. Until that happens, the governor has to, quote, write under his clause. Well, it, you know, I think, you know, they checked with the federal government, and the governor said, if you disagree, then, then, you know, obviously I'll call this off. So I think the U.S. president, they're seeing the president federalize, but the federal government is ultimately the one in control here. And here, you know, they, they put Louie's River in use to take the mouth of the river and it's made its position known. And of course, on immigration, at large, you know, there's, the cases are uniformed that immigration is not the kind of unlawful situation that, you know, the Constitution is talking about. Mr. Gray, on navigability. Yes. You said at the start, of course, both sides are prepared to present any evidence and any theory going to navigability at trial, which is a fast outcome. But based just on the PI record, could you answer yes or no, whether the government's defending Judge Ezra's likely navigability on any of the following theories? One, that border rivers necessarily involve commerce that navigates across them. I'm not going to care if I talk about it in a while. Are you defending that as commerce that can support Section 10 of the Oregon Act? Yes. Just at the time I'm going to interrupt you, because I just want to make sure I can ask it, what theories are you urging? Are you urging that the likelihood of navigability finding is supported also by the fact that Texas erected the border buoy barrier to stop illicit human and narcotics traffic in your courts? Is the illicit commerce itself supportable in Section 10 of the Oregon Act? We have not made that argument. You have not made it, okay. Third, are you presently arguing that the district court's observation on page 18, that a government witness observed a barge alongside it, are you arguing that that supports at least the likelihood of the present navigability, yes or no? Yes. Okay. And last, I'm sure the answer's no here, but are you arguing that the Rio Grande water itself that's traveling the full length of the highway that we owe by treaty to Mexico is commerce that the Army Corps has to maintain by dredging, the water itself? I don't think we've argued that the water itself is commerce. I do want to make a comment about the highway language, because that comes up a lot. And I think there's a significant risk of an activism there with highway. Because if you think of a highway as, you know, an interstate highway or a major thoroughfare, but, you know, at the time these cases were decided, the highway had more general meaning. If you look at the 1824 Webster's Dictionary, it really just means a public way. And it could be as small as something like a footpath, something that connects places. And so this cross-river ferry traffic that we had, significant cross-river ferry traffic, so significant that we had rival companies that filed suit against one another, and it was important enough, lucrative enough, that they took it to the Texas Supreme Court. And so there was a highway across the river that he would pass there, connecting it with Mexico, over which Warren Congress was traveling. And that ought to be enough, especially with preliminary injunction states, to bring the river within the Rivers and Harbors Act definition of navigability. Unless there are questions about obstructions, I think it's an obstruction to the river. It doesn't have to be a major obstruction in order to qualify. Well, I have questions. So are you conceding it's not a structure that aids in obstruction? No, I'm not conceding that. I think it's both a structure in the river that's unpermitted and an obstruction to the cross-river river. It's both of those. Is that a complete answer to Judge Ramos' question? I don't want to settle on the question. Yes, that's a complete answer. In your view, what is the single best piece of evidence that shows this is actually the river that's navigable? I think the best evidence is the evidence of ferry traffic, because it's commerce. It's foreign commerce. It's conducted on the river. So it's a custom. I mean, ferries are the 10th customary mode of trade or travel. I mean, ferries have gone into mythology by the Greeks, right? I mean, it is one of the most customary modes of trade is to ferry across rivers. And so I think it's where it meets the test. And that's the best evidence. It's not the only evidence, but it's the best evidence. If a ferry crosses, and it passes, does that mean the entire river? Or not the entire river? Not the entire river, but it would mean the relevant segment. And what's the relevant segment? Well, here the Department of Engineers defines the segment as roughly, I think it's mile 210 to 610. It's roughly a 335-mile segment. But it's based on— Is that the case that ferries are 335? No, no, no. The river segment is based on the geographic qualities of the river and where there are changes. So in Appalachian Power, for example, the court divided it into three segments. The segment issue was about 50 miles or so. It was based on there are falls down here, there are falls up here, and this is sort of its own section. And so the character of the river is basically the same. Are there waterfalls in the river? Well, I think there is one place down the river where there is—this gets into a bit more of the evidence. We've developed a full-length framework for trial. But there's one place down the river that folks said, this is the small fall that is in the main structure, and that's the place we have to correct if we're going to improve this area. But it's generally known. What's your evidence that ferries cross at this point? Well, the Tugwell case involved the Eagle Pass Ferry Company crossing at Eagle Pass. I don't know if it's in the fountain feet. I don't know if we have evidence of that. But certainly it was in this stretch of the river where there was— Why do you think that would be a problem for your theory? If the ferries are crossing at Eagle Pass and not in this stretch, why do you think that would be a problem? Well, because the relevant question is not—you don't look at tiny little segments. In Utah, it says that you look at, are there general characteristics of navigability in the area? So you don't have to say, well, carry across right exactly here. But Eagle Pass, I think, is sufficient to demonstrate that. Well, you do not have to look at the exact path, the exact fountain feet if you're talking about navigating up and down the river. But if you're talking—your whole theory is that there are ferries crossing at one end and one end 90 degrees across the river, then I would think you would need to have some theory as to why this would be a key ferry traffic at Eagle Pass. No, I mean, it makes no relevant stretch of the river. Well, that's not all we have. We do have evidence of some up-and-down river traffic, and we have evidence of Congress passing statutes to preserve its navigability. I don't want to test your theory. I don't want to resort to hyperbole. But I can imagine a lot of borders, streams, and creeks, as the opposing counsel suggested, where you could have friends just ferrying in a small rowboat Girl Scout cookies. And that sounds sort of absurd, but what's your limited principle? If ferry commerce is sufficient, and let's take it away from the open-water river situation, certainly the Army Corps can't go and dredge every creek where there is regular commerce of that nature. I think the border river is sort of key. I agree. Okay, so you are— I think that you—the key here is that it is one commerce carried out on the border river. That's critical to the test. I think that that's critical to the test. I have a question up here, right up in front of me. Okay, nice. Two questions. Are you principally arguing that the navigability question is a factual one, thus your lead is about clear air? Correct? All right, hold on. That's all? That part. Okay, so a lot of the possibilities in court were firmly convinced that we would be sitting 17 strong here on the question. So assuming that volley has not hit the target totally, then even if it is fact-bound, a lot of their voices that feel that the fact-bound determination may be permeated with legal error. And so if you don't know, that's worse. My question is, assuming the whole is fact, clear air doesn't land at the target, what's your best reliance that there's no legal error? And I would say simply that there is an argument to agree that the district courts rely on a number of precedent that the Supreme Court had advocated is no longer good law, et cetera. So my point is, putting aside a purely fact issue, the argument being that the court is fact-bound determination, but the fact that there's an error legally that aligns with cases that are no longer good law. So I'm just wondering what your position is on that beyond the fact. I think I do follow you. I think what I would say is that the Supreme Court has not explicitly or implicitly done anything to call into question their decisions in economy-like power or their decision in the Appalachian Power. There's no legal error in relying on the navigability test that started with Denning Ball and developed through the Montello in Appalachian Power and economy-like power. And the Texas court seems to suggest that maybe the Supreme Court might do this if it had the chance. But they haven't done so, and the court is bound on those cases, as well as the district. If you were on our court, what would you write in response to Judge Wolf's dissenting opinion? Good question. If I were on the court, what would I write in response to Judge Wolf's dissenting opinion? I would write that the opinion fails to take into account the clear error standard on navigability and that it does not give sufficient credit to the harms that's articulated by our witnesses. Those would be my main objections. Isn't there some clear error, though? Because the district court said it was a boom, and the government doesn't even argue that and ignored the witness that talked about that. So isn't that error? Oh, no. The government certainly, we argued in the district. And there was one witness. You'd have to hear him, just like he didn't think it was a boom. That's true. But our argument was that it was a boom. We've argued that it was a boom. Yeah, it was our witness. But that's not some sort of binding consensus. Yes, we maintain that it is a boom. I mean, a boom is a strong chain linked together. It's a block passage. That's exactly what this is. This is chains linked to these floating structures anchored by concrete designed to block passage. It's explicitly within the definition. But even if it's not, it's still another structure. I mean, it's a structure under the Act. So I don't think one witness's response to one question that, you know, an emergency hearing comes from your hearing bound the federal government on that question. The Supreme Court has described booms as an object that crosses the channel on the river and entirely fills it. Entirely fills it. In the Bellevue Bay Boom Company case. Well, I mean, I think the normal definition of a boom is that it blocks passage in some way. But you have booms that go out into the river. It's sort of blocked and blocked from coming down. There's all sorts of booms. They don't necessarily stretch across. Do you concede there is error at all in the district courts opinion? No. I don't see any error, particularly not on this question. I think it's... Any question? No. No. I don't concede any error. Was the district court wrong in talking about the boom stories about drownings? Well, I don't know that we... We certainly didn't argue for that. I don't know that that affected its legal analysis in issuing the preliminary injunction. You know, I... I don't think I can speculate at all. Mr. Gray, let me ask you a quick question about your ferry. Yes. Theory of navigability. And it kind of relates to Ms. Pettit's introductory remarks. Can ferry traffic be part of interstate or foreign commerce without the evidence of navigability? I don't think so. Because it's... Because the ferry traffic is carried out on water in a customary mode of trade on water... I mean, that's because the Supreme Court has repeatedly said that a river is navigable, that it is or if it was or is susceptible to being used as a pilot of interstate or foreign commerce. And the court has also suggested that ferries do not use rivers as highways. It is said that ferry traffic crosses the highway that's formed by the navigable river. That ferry traffic is a continuation not of the river but the highway on one side of the river to the other side of the river. So it seems to me no matter whether interstate ferry traffic or foreign ferry traffic is part of commerce, if it doesn't use the river as a highway, as Ms. Pettit described, then it's not evidence of navigability. Well, I think this again goes back to what my discussion a little bit earlier about what's a highway. And I don't think it necessarily carries the same meaning that we think of today. I think that cross-river ferry traffic explicitly in foreign commerce or at least that segment of the river is establishing a highway for commerce between those two points, even though it's small. And so I don't think that you can just exclude ferry traffic altogether. It's clearly commerce. The question is, does the Rivers and Harbors Act bring it within the Congress's power to regulate our statute? There's no reason to believe that Congress would not have wanted to prevent obstructions to cross-river commerce carried out on the water in the Rivers and Harbors Act any less than it would have wanted to prevent obstructions. Have there been any cases that have excluded ferry traffic altogether? I'm not aware of any that have excluded it. It's considered both by this Court in the Punter and Nelson case and by the Supreme Court. I guess there's the Crow and Pope case. That's the Northern District of Georgia case? No, the Northern District of Georgia case, where the river was the Chattanooga River entirely within the state of Georgia. And so the cross-river ferry traffic was not engaged in interstate foreign commerce. But that's the only case that I know of that discounts ferry traffic completely. And you're not aware of any other? We're not in a position on the border patrol bus. You said the best evidence you can decide that. Yeah, I think that is evidence. I think the ferry traffic, because it was specifically commerce, was the best evidence. But the border patrol bus, again, I think the outlaw's power says, it doesn't matter if there's not commercial traffic, if there's other traffic on the river that shows that there could be commercial traffic. And I think border patrol boats, in response to Jason's question, the Texas Barge, the canoe company that operated in the river, these all show that there's sufficient water in the river for the simpler types of commerce. Thank you. Thank you, Your Honor. So to pick up on the standard review point, again, I would point this Court to page 404 of Appellation of Power. It is a fact question, but the manner in which the Court did it, that both the standard and the ultimate conclusion involve questions that are a lot inseparable from the particular facts to which they are applying. So it's a bit of a cork-eating, fact-check question. And here, there are numerous legal errors that are included or that are built into the District Court's fact-aligning. The first is that it relies so heavily, in fact, I would say exclusively, on cross-river traffic. And I'd like to pick up on Judge Willett's point on that particular question as well as Judge Douglas's. It's not the question of whether ferry traffic is excluded. It's whether it is relevant, whether it is sufficient to act as and want to be a highway at the Interstate Commerce. And if a ferry was sufficient, the Appellation of Power case would have been a lot shorter because there was ferry traffic there, too. But instead, the Court went to considerable effort to note 14 documents and instances where there was downriver traffic. And that's the type of language that's been used for navigability all the way back to Federal Cases No. 2, where our first Chief Justice, John Jay, described our question of navigable waters that tie our nation together. What was the procedural posture of that case? It does not make a difference for the purposes of what the legal standard is. What was the procedural posture of the case once that finding was made? I don't have anything on the top of my head, Your Honor. But for the purposes of the legal standard, if cross-river traffic had by itself been sufficient, then it would have not been necessary for the Court to go to such length to describe all the times that people have traveled downriver, tying our nation together in Chief Justice Jay's words. In terms of the boundary water, that's not tying the nation together, that's dividing us. So again, you're saying just on three states, the state being the river between Texas and Louisiana, lots of freighter traffic, the Pearl River on the other side, Louisiana, Mississippi, you're saying the Army Corps does not have Section 10 authority to dredge, to continue that into a state promise? Not at all, Your Honor, because there's also a downriver promise. There has to be always downriver. There has to be a new theory in Section 10. Under Section 10, I think that's right. There are, for example, in the Clean Water Act, which gives additional authority and talks about boundary waters, that study is I think it's 33 U.S.C. 1370 that I could have at home. There's actually a specific provision granting boundary waters. Boundary waters primarily involve navigation back and forth. No, Your Honor, I don't necessarily agree with that. For example, in Mississippi, there's a border between a lot of different states, and there's traffic all the way down. In fact, there are websites that actually allow you to track in real time the traffic that goes down in Mississippi. That's a length on the way of downriver. And going to the question that we had briefly about what is preventing traffic down here to your question, Your Honor, there are faults in the Rio Grande. In fact, there is a fault right above the rail, which is what has prevented River John River traffic above the rail from time immemorial. And why the head of navigation is at Rama, which is downriver of the rail. Going to the question of whether this is impairing government function, my friend mentioned that. I would put you, Your Honor, to page 1021 of the record, where it's discussing whether this is impeding cross-border border control. All it says is include. Not really pass. And in this instance, if they're talking about trying to prevent, there are a number of questions about our right to self-defense, you would at least expect some example where it actually has impeded them. To the contrary, a number of the witnesses, and I'm looking at ROA 4546 and ROA 491, have said it is not impeding government functions. And going to the invasion question that Judge Jones announced today. On page, I would point you, Your Honor, specifically to page 403 of the Sterling Opinion that my friend cited that says that these issues are sometimes real. What it actually said was in that instance, no military is exempted from any point of view. The review that they're talking about is a good faith review. If, unless you can say, under no circumstances, is this an invasion, the court can't look at it. And I would point you, Your Honor, to a very helpful article that was from Professor Nielsen, cited by the Constitutional Right to Defense Fund in the history, which describes why that standard can't be met here, because the term invasion was actually used to describe an immigration from Connecticut to Pennsylvania in 1755. Ms. Petty, Chief Judge Rinsgren asked about the border patrol boats. What's the state's response to that? The state's response is that border patrol boats on their own cannot show commercial navigability because they are on commerce. Thank you for the reference. Are there any cases that would describe it as an invasion? There are not a number of any cases. The cases to which my friend is citing actually were political questions, cases that have had a case where the plaintiff is claiming that this was not an invasion actually was pre-Steelco. It assumed the jurisdiction in a way this court couldn't have explained. And the district court said that the question of whether it was an invasion is non-justicial. You told us that you agreed with that. Yes, Your Honor. Whether it's an invasion or not is not something that we can confirm. Yes, Your Honor. Unless they can have a show of hands there is no condition under which it could be considered an invasion and they have not intended to do so. Counsel, I know you're trying to develop a key point on one of the questions. Let me ask this. You said that the border patrol boats were insufficient because of psychology. It seems to me that's not the question as to whether the boats themselves are equivalent to the trade boats that we would be able to use in commerce. The response to that was that the drafters are not the same size or whatever else. So you don't have to show commerce but you should show what's possible. I agree with the general opinion of the court that the boats that we're talking about are the boats which have every couple of inches of draft. Modern commerce has to be something like several feet. And here we would have only about 18 inches worth of water and that's not sufficient for commerce. The existence of these border boats is not at this level. Where does that work? The 18 inches is 3 feet. That is on page ROA 1280. There are also some very helpful photographs on 1021 and 1020 where you're actually seeing the people who are installed in these buoys walking in the water and you can see their face. There are no further questions. Thank you.